TCHULA COMMERCIAL CO. *et al. v.* JACKSON.*

(Division B.   March 28, 1927.)

[111 So. 874.   No. 25847.]

1. MORTGAGES.  *Equity may relieve against mortgagee's buying and selling property contrary to oral agreement with mortgagor.*
   Where a person gives a deed of trust on real estate to secure a debt to a bank, and such bank procures another corporation of which the president of the bank is also president and a largely interested stockholder, to take up a portion of the bank's debt because the loan represents too large a portion of the bank's capital for a single loan, and such corporation also takes a deed of trust upon the same land to secure its debt, and each corporation has separately assigned to it the same insurance policy as collateral security, and where there is an agreement by the commercial corporation to  take up the bank's debt, or get it extended, and an agreement by both the bank and the commercial corporation that an agreement, verbally made, will be reduced to writing before the sale under the deed of trust is made, or that it would be bought in and held for the benefit of the grantor, who would by the agreement have a specified time in which to pay the debts off, and where the land was sold before the agreement was reduced to writing, and was bought in by the bank and afterwards sold to persons interested in the said corporations, a court of equity has jurisdiction to grant proper relief in the premises.

2. CORPORATIONS.  *Equity.   Mortgagor may sue for relief against sales of mortgaged property contrary to agreement in county where general agent of nonresident insurance company whose policy was assigned to mortgagees is found; bill for relief against sales of mortgaged property by mortgagee is not multifarious for joining insurance company whose policy was also assigned (Code 1906, section 707, as amended by Laws 1918, chapter 149; Hemingway's Code, sections 465, 486, 488, 4093, 4094).*

Under hypotheses stated in the foregoing syllabus, the complainant may join as defendants, in a bill for relief, all the defendants in a single suit in a county where a general agent of the insurance company may be found and be doing business in the state; such insurance company being a nonresident corporation. Such bill is not multifarious, the said insurance company being a necessary party to full and complete relief.

3. CORPORATIONS. *Venue of suit in county of office of nonresident corporation, necessary defendant, will not be changed because citizen of another county is party thereto (Code 1906, section 707, as amended by Laws 1918, chapter 149).*

Under section 707 of the Code of 1906 as amended by chapter 149, Laws 1918, providing that civil actions may be brought in the county in which the defendant or any of them may be found, etc., a process may be issued to any other county or any other defendant, and if any citizen resident of this state be sued in any action, not local, out of the county of his residence, venue shall be changed to the county of his household or residence. The venue will not be changed if suit is brought in a county where any necessary defendant may be found, even though the defendant is a nonresident corporation having an office in such county.

4. FRAUDS, STATUTE OF. *Suit for damages may be maintained on mortgagees' oral agreement to buy mortgaged property and hold it for mortgagor, regardless of statute.*

Where the bill is filed alleging facts to show hypotheses stated in the first syllabus, alleging a fraudulent purpose on the part of the defendants not to perform the agreement, and the facts as found by the chancellor sustain the contention of the complainant, and such finding is supported by evidence, the statutes of fraud do not apply; the suit not being for specific performance but for damages for failure to carry out the agreement.

5. APPEAL AND ERROR. *Where chancellor finds all facts, supreme court reversing decree as to damages will render judgment for proper amount (Hemingway's Code, section 3195).*

Under section 4919 of the Code of 1906, section 3195, Hemingway's Code, where a judgment or decree rendered by a chancellor is clearly excessive and all the facts are found by the chancellor, and where the amount of the judgment is based on facts and opinions of witnesses as to value, this court will, on reversing the

decree as to the amount of the damages, render judgment for the ·proper amount without remanding the cause to the court below.

*Corpus Juris-Cyc. References: Appeal and Error, 4CJ, p. 898, n. 86, 87; p. 1158, n. 19, 21; Corporations, 14aCJ, p. 1400, n. 91; p. 1401, n. 9 New; Equity, 21CJ, p. 423, n. 38; Frauds, Statute of, 27CJ, p. 340. n. 77; p. 342, n. 84, 85, 86; Mortgages, 41CJ, p. 662, n. 18; p. 894, n. 59.

Appeal from chancery court of Lauderdale county.
Hon. G. C. Tann, Chancellor.

Suit by E. E. Jackson against the Tchula Commercial Company and others. From a judgment for complainant, the Tchula Commercial Company and another appeal. Affirmed in part, and reversed in part.

*Boothe & Pepper* and *Bozeman & Cameron,* for appellants.

I. The demurrers of the Merchants' & Planters' Bank and Tchula Commercial Company should have been sustained. The bill is clearly multifarious. The authorities on this point are practically one way. See section 358, Hemingway's Code, Multifariousness. The leading case in this state as to multifariousness of a bill in chancery is *Carter* v. *Kimbrough,* 122 Miss. 543. See, also, *Darcey* v. *Lake,* 46 Miss. 109.; *Roberts* v. *Starke,* 47 Miss. 257; *Tohms* v. *Tohms,* 46 Miss. 263; *Banking Co.* v. *Humphries,* 64 Miss. 258, 1 So. 232; *Hardie* v. *Bulger,* 66 Miss. 577, 6 So. 86; *McNeel* v. *Burton,* 1 How. 510; *Boyd* v. *Swing,* 38 Miss. 182; *Seleek* v. *Compress Co.,* 72 Miss. 1024, 17 So. 603; *McGowan* ·v. *McGowan,* 48 Miss. 553; *Jones* v. *Foster,* 50 Miss. 47; *Guest* v. *Strahan,* 106 Miss. 1, 63 So. 313; *Nelms* v. *Brooks,* 105 Miss. 74, 61 So. 985; *Roberts* v. *Burwell,* 117 Miss. 451, 78 So. 357; *Reese* v. *Solomon,* 99 So. 482.

In Judge Griffith's very admirable work, ''Mississippi Chancery Practice,'' a very thorough discussion of what constitutes multifariousness is laid down, sections 204-06, inclusive.

The bill of complaint in this case sets out that on the first of January, 1923, the complainant gave two deeds of trust and two notes for entirely separate and distinct indebtednesses; one to the Tchula Commercial Company, a corporation domiciled and doing business at Tchula, Holmes county, Mississippi; and one to the Merchants' & Planters' Bank, a banking corporation domiciled and doing business at Tchula, Holmes county, Mississippi. It is not alleged or claimed that the Commercial Company was interested in the debt due the bank, nor that the bank was in anywise interested in the debt due the Commercial Company. Nor is it alleged or claimed that the New York Life Insurance Company was in anywise interested in the debts due by complainant to the bank or to the Commercial Company.

Because of this defect in the bill, the judgment of the court below must be reversed and the cause remanded. *Clark* v. *Miller,* 105 So. 502.

II. The chancery court of Lauderdale county was without jurisdiction. Griffith's Miss. Ch. Pr., sections 21, 24, 25, 27, 29, 30. Neither the complainant nor the defendants, Tchula Commercial Company and Merchants' & Planters' Bank, were citizens of, resided in, or had any property or business interest in Lauderdale county, Mississippi.

Under Code of 1906, section 707, as amended by Laws of 1908, chapter 166, and Laws of 1918, chapter 149, requiring civil actions to be brought in the county in which the defendants or any of them may be found, but providing that a resident sued out of the county of his residence may have the venue changed; joint actions may be commenced in the county in which either defendant resides, and service on defendant residing in another county is valid and binding. *Indianola Cotton Oil Co.* v. *Crowley,* 121 Miss. 262, 83 So. 409.

The above provisions are applicable to courts of equity, so held in *Masonic Benefit A. & S. G. L. of M.* v. *Dodson,*

111 Miss. 60, section 687, Code of 1906, having provided that the above section shall apply to chancery courts as well as to circuit courts. The jurisdiction over domestic corporations in chancery courts is, therefore, determined by the jurisdiction over domestic corporations in circuit courts. *Plummer-Lewis Co.* v. *Francher,* 111 Miss. 656, 71 So. 907. Following the decision of this case, section 707, Code of 1906 (section 486, Hemingway's Code) was amended.

The bill of complaint does not set up a cause of action which in the slightest degree falls under this amendment; therefore the bill should be dismissed, as these defendants, domestic corporations, have no right to a change of venue under the provisions of the *Plummer-Lewis case, supra.* See, also, *Morrimac Veneer Co.* v. *McCalip,* 92 So. 817.

III. *Fraud:* No fraud of any kind is alleged in the execution and delivery of these instruments. Neither the title of the bank acquired at trustee's sale, nor the title of the present owners, J. M. Howard and O. W. Nixon, is in anywise attacked for fraud. See section 339, Hemingway's Code (section 579, Code of 1906); *House* v. *Gumble,* 78 Miss. 259, 29 So. 71; *McNeil* v. *Lee,* 79 Miss. 455, 30 So. 821; *Weir* v. *Jones,* 84 Miss. 610, 39 So. 533; *McKinney* v. *Adams,* 95 Miss. 832, 50 So. 474; *I. O. of S. & D. of J. of A.* v. *Moncrief,* 96 Miss. 419, 50 So. 558; *Carpenter* v. *Douglas,* 104 Miss. 74, 61 So. 161.

A defendant charged with fraud may always challenge the sufficiency of complainant's averments thereof; and if the bill does not in fact charge fraud, defendant may demur without interposing an answer. *N. U. F. I. Co.* v. *Standard Drug Co.,* 117 Miss. 429, 78 So. 353; *Watts* v. *Patton,* 66 Miss. 54, 5 So. 628; *Patton* v. *Edwards,* 29 Miss. 67; *Davis* v. *Davis,* 62 Miss. 818; *Canton Warehouse Co.* v. *Potts,* 68 Miss. 637; *Anderson* v. *Winston,* 5 How. 279; *Bell* v. *Henderson,* 6 How. 311; *Smith* v. *Williams-Brooke Co.,* 111 Miss. 393, 71 So. 648.

IV. *Statute of Frauds.* Notwithstanding its promise and agreement, said Commercial Company and said bank never did carry out their promises and contract of February 21, 1924, to execute the contract in writing, making excuse after excuse from time to time for not doing so, and repeatedly assuring complainant that the verbal contract and agreement of February 21, 1924, made by complainant with said Commercial Company and said bank would be fully carried out, whether any contract was ever signed or not.

This alleged verbal agreement is, of course, void and unenforceable, being in direct violation of section 3119, Hemingway's Code. It is also condemned by section 2267, Hemingway's Code. Even if reduced to writing, the deed must be delivered by the grantor to the grantee. *Paul* v. *Waddell,* 78 Miss. 15; *Miazza* v. *Yerger,* 53 Miss. 135; *Gibson* v. *Foote,* 40 Miss. 788; *Clereman* v. *Cotton,* 66 Miss. 467; *Campbell* v. *Bright,* 87 Miss. 443, a case almost on all-fours with the case at bar.

Complainant's alleged verbal contract in reference to the sale, purchase and reconveyance of the plantation does not include the personal property which was sold under the Merchants' & Planters' Bank deed of trust. The same statute of fraud, however, section 2123 (Sales of Personal Property), provides that if the price to be charged and paid is fifty dollars or more, that contract has to be in writing, or part of the property delivered by the seller and accepted by the purchaser. *Easley* v. *Stewart,* 131 Miss. 756; *Young* v. *Alexander,* 123 Miss. 708.

In reference to complainant's claim and allegation in the bill that he has a right to an accounting as to the crops raised on Oswego Plantation for the year of 1924, that contention is settled by *Harvey* v. *Daniels,* 133 Miss. 40.

The statute of frauds applies even where a memorandum in writing is made, but written memorandum failing to state purchase price and terms of payment, held insufficient under section 3119, Hemingway's Code, to compel specific performance. *Strum* v. *Dent,* 107 So. 277;

*Nickerson* v. *Land Co.,* 118 Miss. 722, 80 So. 1; *Howie* v. *Swaggard,* 107 So. 556.

The Howie case and the authorities there cited are, in our opinion, conclusive against appellee in this case on every contention and allegation in his bill of complaint, and the demurrers of appellant should have been sustained, and the court below in failing to sustain the demurrers, should have dismissed the bill of complaint on the final hearing on the pleadings and proof on the merits of the cause.

Supplemental brief for appellants, by *Bozeman & Cameron* and *Boothe & Pepper.*

I.   The agreement, as contended for by the appellee, is a verbal agreement not to foreclose a deed of trust on land and is a verbal agreement for a right to redeem land from a foreclosure sale under a deed of trust.   Any such agreement is void and unenforceable under the statute of frauds.   Sections 3119 and 3124, Hemingway's Code; *Rutland* v. *Brister,* 53 Miss. 683; *Clearman* v. *Cotton,* 66 Miss. 467; *Campbell* v. *Bright,* 87 Miss. 443; *Miazza* v. *Yerger,* 53 Miss. 135.

II.   So a parol agreement to execute thereafter a written contract required by the statute of frauds is itself invalid.   *Hand* v. *Osgood,* 107 Miss. 55, 64 N. W. 867, 61 A. S. R. 312; *Rowell* v. *Smith,* 123 Wis. 510, 102 N. W. 1; 3 Ann. Cas. 773; 25 R. C. L., page 481, section 22; *Berry* v. *Bullock,* 81 Miss. 463.

III.   We submit further that the court below erred in overruling the demurrer to the bill because the bill showed that the court had no jurisdiction of the case.   In our opinion, whether or not the court below had jurisdiction of this case, depends entirely on whether or not the New York Life Insurance Company was a "necessary party defendant."   See section 321, Hemingway's Code, "Venue of Suits in Chancery."

The complainant attempts to confer jurisdiction on the chancery court of Lauderdale county and to deprive the main defendants of their right to be sued in the county of their residence, by joining as co-defendant the New York Life Insurance Company and alleging that it has agents who can be served with process in Lauderdale county.

If the New York Life Insurance Company is a ''necessary party defendant'' and was found in Lauderdale county, then it may be that the Lauderdale county court acquired jurisdiction; but if the New York Life Insurance Company is not a ''necessary party defendant,'' then the chancery court of Lauderdale county was without jurisdiction.

The jurisdiction of the court below was properly challenged by demurrer. *Pollard* v. *Phalen,* 98 Miss. 155.

An analysis of the bill will demonstrate that this is a suit between the complainant and the defendants bank and Commercial Company for an accounting and for damages in money for the alleged breach of a verbal contract to permit the complainant to redeem land and personal property situated in Holmes county. The ostensible relief sought against the New York Life Insurance Company is the merest incident to the main suit. The Life Insurance Company may possibly have been a ''proper party,'' but certainly was not a ''necessary party defendant.''

In this connection we call the court's attention to the difference between the wording of section 468, Hemingway's Code, ''Venue of Actions in Circuit Court,'' and section 321, ''Venue of Suits in Chancery Court.''

The only real defendants here had a right to be sued in the county where they reside or may be found. The county where they—both domestic corporations—reside or may be found is held by this court to be the county of their domicile or principal place of business. *Plummer* v. *Francher,* 111 Miss. 565, 661. It was also held in that case that a corporation had no right to apply for a change

of venue. See, also, *Wherry* v. *Lattimer*, 103 Miss. 524; *Lipscomb* v. *Jack*, 20 So. 883; 20 R. C. L., page 678; Griffith's Miss. Ch. Pr., section 107.

IV. We submit that the charge of fraud taken in connection with the contracts and the breaches thereof set out in the bill, is a mere conclusion of law and was not such a charge of fraud in the bill as would prevent the court below from sustaining the demurrer, although no answer was filed denying the fraud. *Howie* v. *Swaggard*, 107 So. 556.

V. *Value of Land and Personalty.* The fundamental and cardinal principle of the law of damages is compensation for injury sustained. Actual pecuniary compensation is the general rule whether the action is on contract or in tort. 8 R. C. L. 431.

Another rule is that in no case should the injured party be placed in a better position than he would be had the wrong not been done. 8 R. C. L., page 435; 8 A. & E. Enc. of Law (2 Ed.), pages 634-35; *Cain* v. *Kelly*, 57 Miss. 830; *Jamison* v. *Moon*, 43 Miss. 598; *Levee Com.* v. *Hendrix*, 77 Miss. 483-86.

Measured by this rule, we submit that the complainant did not offer any competent evidence and that there is no competent evidence in the record to support the decree of the court below. Such opinions as those of complainant's witnesses here are admissible "in the absence of better testimony" to assist but not control the court, as held in *Levee Com.* v. *Dillars*, 76 Miss. 641, 650. See, also, *Levee Com.* v. *Hendrix*, 77 Miss. 483-86; *Gordon* v. *Danborn*, 39 S. W. 291 (Tex.); 3 Sedgwick on Damages, section 1018; *Gilbert* v. *Cherry*, 57 Ga. 130; Sutherland on Damages, section 570, page 1940.

*May, Sanders & McLaurin,* for appellee.

The various contentions urged, both in the original and supplemental briefs, may be grouped under four general propositions.

I. *The legal insufficiency of the bill.* The first ground discussed is multifariousness. It seems perfectly clear to us that a cause of action based upon conjoint efforts of two parties to deprive a third person of his rights, privileges, benefits and immunities created under a contract with one of the joint actors, may be stated against the two joint actors without rendering the bill subject to objections for multifariousness. This is the case here.

The bill alleges, and there was proof to show, that both the bank and the Commercial Company held an assignment of appellee's policy of life insurance, issued by the defendant, New York Life Insurance Company; and the bill alleges that the indebtedness of appellee to the bank and to the Commercial Company having been paid by appellee, he was entitled to have these assignments cancelled and the policy restored to him on the books of the New York Life Insurance Company. All these parties having an interest, or claiming an interest in said policy, such interest could not be ascertained or adjudged and relief granted to all parties concerned except by having all parties in court under the allegations showing their respective interests or claims and surely could not be multifarious on this ground.

II. *Want of jurisdiction in the chancery court of Lauderdale county.* Jurisdiction of the court over the defendants to the bill is conferred by sections 321 and 486, Hemingway's Code, as interpreted by the decisions annotated thereunder, particularly, *Indianola Cotton Oil Co.* v. *Crowley,* 121 Miss. 262, 83 So. 409; *Dean et al.* v. *Brannon,* 139 Miss. 321, 104 So. 175. *Plummer-Lewis Co.* v. *Francher,* 111 Miss. 656, has no sort of application here for the reason that in that case there was a single defendant—a domestic corporation—and it was sued outside of the county of its domicile.

III. *Want of right in complainant to maintain suit.* Appellants contend that because the record title to the

Oswego plantation was in E. A. Jackson, son of appellee, E. E. Jackson, the complainant, E. E. Jackson, could not maintain the suit.

Immediately upon the execution of the deed of conveyance from E. E. Jackson to his son, E. A. Jackson, the latter reconveyed to the former the legal title to said land, and the latter deed of conveyance was thereafter delivered in person to the president of the appellant bank and the appellant Commercial Company. The chancellor found this to be the fact.

IV. *Insufficient evidence to support decree.* The finding of the chancellor on disputed issues of fact will not be disturbed unless manifestly wrong. No legal principle has been presented or is involved here.

We answer the questions as to the application of the statute of frauds, by the well-settled rule announced in the leading case, *Laing* v. *McKee,* 13 Mich. 124, 87 Am. Dec. 738. This decision was cited and approved by our own supreme court as announcing the correct rule. See *Barnett* v. *Nichols,* 56 Miss. 622; and also *Kelly* v. *Wagner,* 61 Miss. 303; *Burridge* v. *Gumbel,* 72 Miss. 371; *Trust Co.* v. *Peters,* 72 Miss. 1071; *Brown* v. *Lyon,* 81 Miss. 438; *Kritzer* v. *Moffat* (Wash.), 240 Pac. 351, 44 A. L. R. 681; *Pocatello Security Trust Co.* v. *Henry,* 35 Idaho, 321, 206 Pac. 175, 27 A. L. R. 337.

Applying the rule stated in varying forms in the foregoing authorities, to the evidence as to the statements, promises and agreements made by the appellants Commercial Company and the bank, it follows that the chancellor's decree should be upheld as to both appellants, and particularly, as to the appellant Commercial Company for its breach of the contract of November, 1923.

It is objected by counsel for appellants that the witnesses testifying for the complainant were not qualified to give competent and satisfactory testimony. This question as in the other questions urged upon the court, has been ruled adversely to appellant's contention. *Lev-*

*ee Com.* v. *Nelms,* 82 Miss. 416, 34 So. 149; *Hiller* v. *Ellis,* 701.

Argued orally by *A. M. Pepper* and *A. S. Bozeman,* for appellants, and *Geo. S. May* and *H. C. Holden,* for appellee.

Etheridge, J., delivered the opinion of the court.

The appellants appeal from a judgment of the chancery court of Lauderdale county, rendered against them and the New York Life Insurance Company in favor of E. E. Jackson, appellee.

Jackson filed his bill against the Tchula Commercial Company and the Merchants' & Planters' Bank, each being a domestic corporation, chartered under the laws of the state of Mississippi, and domiciled at Tchula, Holmes county, Miss.

The New York Life Insurance Company is a foreign corporation, having an agent and place of business in Lauderdale county, Miss.

The complainant was a resident of Rankin county, Miss., and in the year 1917 purchased from Mrs. Eva Hudson a plantation in Holmes county consisting of about one thousand one hundred acres, known as the Oswego plantation, the purchase price of which was fifty-five thousand dollars. He paid five thousand dollars in cash, and for the balance (which was to be paid in ten equal installments of five thousand dollars each) he gave his notes bearing interest from January 1, 1918. Jackson took charge of the said plantation and operated it from January 1, 1918, until the fall of 1923, during each of which years he procured advancements of money and supplies from the defendant commercial company for the operation of his plantation. On January 1, 1923, Jackson executed a note and deed of trust covering Oswego plantation to the said commercial company to secure an indebtedness of thirty-one thousand dollars, which in-

debtedness included past debts and future advances. On or about January 1, 1923, complainant also executed a note and deed of trust covering the said Oswego plantation to the Merchants' & Planters' Bank, in the sum of ten thousand dollars, to secure a loan, and assigned to the said bank a certain insurance policy on his life, written by the New York Life Insurance Company. Jackson alleged that he had also assigned the said policy to the commercial company, and that the commercial company had full knowledge of his previous assignment of this insurance policy to the bank; that the assignment of the policy was for collateral security in each case. The commercial company denies the assignment of the policy of insurance to it, but the answer of the bank and of the New York Life Insurance Company show that the policy had been assigned to the bank. The answer of the life insurance company also shows that a loan had been obtained on the said insurance policy from the said insurance company, for the purpose of paying the premiums as they matured.

The bill further charged that in September, 1923, the complainant and the commercial company agreed, both orally and in writing, that the commercial company would take over the operation of the plantation for the balance of the year 1923 and for the year 1924; that the commercial company would pay off the indebtedness to Mrs. Hudson due January 1, 1924, and pay off the note and deed of trust of Jackson to the defendant bank, or have the said indebtedness extended by the bank, also pay off the debts owing by the complainant in connection with the operation of the Oswego plantation, and furnish money and supplies with which to operate the place until January 1, 1925; that it was agreed and understood that the commercial company would have full charge of the operation of Oswego plantation, and that the expense of such operation would be charged to the complainant, and the profits of the crops credited on complainant's indebtedness to the said company; that the said com-

pany agreed to furnish complainant monthly itemized statements; that the contract provided that it might be terminated at any time by the payment of complainant's indebtedness to the said company.; that the consideration for the making of the said contract was the advancement of money and supplies by the company on the one hand, and the payment of interest and the earning of profits on merchandise on the other hand. The bill charged that the said commercial company did take over the plantation and operate it for the remainder of the year 1923, and the year 1924; that it made large profits, the exact amount of which was unknown to complainant; and that said company refused to furnish statements showing the result of the operation of the plantation during those years.

The bill charged that, notwithstanding the said agreement, the complainant was informed in February, 1924, that his deed of trust to the bank would be foreclosed; that his plantation was at that time being advertised for sale on March 3, 1924; that thereupon complainant had a conference with the officers of the commercial company and of the said bank, about February 21, 1924, at which time it was verbally agreed between the parties that the commercial company would buy in the plantation at the trustee's sale, and operate the same for the benefit of complainant, with the right of the complainant to redeem the same at any time before February 1, 1925, by paying all that he owed the said commercial company; that complainant was to be charged, by the terms of this agreement, with all outlays, and credited with all receipts from and upon the operation of the said plantation; that it was further agreed that this oral agreement would be reduced to writing by an attorney representing the bank and the commercial company, just as soon as said attorney recovered from his then illness. It was further agreed that if the written contract should not be prepared in time, then the trustee's sale would not take place. The bill charged that despite the said agreement, the plan-

tation was sold on the date advertised, under the deed of trust to the said bank, and that the said bank became the purchaser thereof; that subsequent to the said trustee's sale, the commercial company and the bank reiterated their agreement to fully protect complainant and carry out their said oral contract and agreement, and assured complainant that said contract would be reduced to writing, but this was never done; that, nevertheless, the commercial company and the said bank continued to assure complainant that they would carry out their contract regardless of whether it was put in writing, and these assurances continued until the latter part of July, 1924.   The bill further alleged that in September, 1924, complainant tried on several occasions to get a statement from the commercial company showing the *status* of all complainant's indebtedness, and the operation of said plantation up to that date, but that said company refused to render such a statement, although the complainant insisted that he wanted the statement for the purpose of paying off his entire indebtedness; that the company only furnished complainant with a statement showing operations to March 3, 1924, the date of the sale. .

The bill alleged that at various times between September 1, 1924, and February 1, 1925, complainant was able, ready, and willing to pay off his entire debt to the commercial company, also his entire debt to the said bank, and that he offered to pay all of his said indebtedness if the commercial company would render him a statement, or inform him of the exact amount thereof, but that the said company unlawfully and wrongfully refused to render an accounting, or to accept complainant's offer, and that thereby  the complainant lost his plantation, to his damage in the sum of one hundred seventy-five thousand dollars.  The bill alleged that the said plantation was worth one hundred sixty-five thousand dollars, and that the personal property thereon was worth ten thousand dollars at the time of the sale under the deed of trust; that complainant does not know how much

he owes the said company and the said bank, and asks for an accounting by the said commercial company from January 1, 1918, to the date of the filing of the bill.

It further alleged that the commercial company breached its contract with complainant by failing to pay or to have extended complainant's indebtedness to the defendant bank, and that by reason of said breach the said plantation was sold to satisfy the said indebtedness; that both the commercial company and the bank breached their contracts made with complainant in February, 1924, whereby it was agreed that the said commercial company would buy in the said plantation at the said trustee's sale, and hold it for the benefit of complainant and convey it to him upon the payment of all his indebtedness; that the breaching of said contract was in furtherance of a conspiracy by the said commercial company and the said bank to fraudulently deprive complainant of his said plantation and personal property, and place the title thereto in J. M. Howard, president of the said commercial company and of the said bank, and O. W. Nixon, a director of the said bank and manager of the said commercial company. The bill further charged that on January 20, 1925, the said bank sold and deeded the said land and personal property to J. M. Howard and O. W. Nixon. The bill further charged that because of the breach of the said contract complainant had been damaged in the sum of one hundred seventy-five thousand dollars, the value of the said plantation and personal property, which said sum is far greater than any indebtedness owing by the complainant to the defendants.

The bill prayed: (1) For a cancellation of the claims of the defendants to the said policy of life insurance, and the payment to the complainant of the dividends due thereon, and the reinstatement of the said policy as the sole property of the complainant; (2) an accounting between complainant and the defendant commercial company from January 1, 1918, to date; (3) a decree for one hundred seventy-five thousand dollars, the value of

the said plantation at the time of sale under the deed of trust and thereafter, together with interest on such sum from March 3, 1924, subject however, to a credit upon said sum of the amount which was ascertained to be due by the complainant to defendant commercial company for money, supplies, etc.

The defendant commercial company and the defendant Merchants' & Planters' Bank filed separate demurrers to the bill of complaint, which were overruled by the court.

The New York Life Insurance Company answered the bill, admitting that it was the insurer of the life of the complainant in the sum of ten thousand dollars, under policy No. 7,479,996, issued in May, 1919, admitting that the premiums on said policy had been paid up to and including May 5, 1925, and averring that there was a loan of one thousand eight hundred ninety-six dollars and three cents on said policy which represented premiums not paid in cash, and averring and setting forth an assignment of said policy, dated the 29th day of December, 1919, by the insured and his wife to the Merchants' & Planters' Bank of Tchula, Miss. It denied any knowledge of an assignment of said policy to the Tchula Commercial Company, or to any one other than the assignment to the Merchants' & Planters' Bank.

The Tchula Commercial Company filed its separate answer of general denial of the allegations of the bill, the answer particularly denying that the plantation was of the value of one hundred seventy-five thousand dollars, but averring that it was never worth more than sixty-five thousand dollars, which amount was approximately the total indebtedness of complainant secured by note and deed of trust on said plantation at the time of its sale under the deed of trust. The answer particularly denied that the commercial company had made a contract with the complainant in September, 1923, or that the commercial company had made a verbal contract with complainant on February, 1924, as alleged in the bill. The answer

particularly denied the making of any agreement, oral
or written, whereby the complainant was to have the right
to redeem the Oswego plantation subsequent to its sale
under the deed of trust to the bank, upon payment of all
his indebtedness on said plantation; denied further that
the defendant commercial company had agreed to buy
in the plantation at the trustee's sale, and operate it for
the complainant, crediting him with receipts and charg-
ing him with expenditures, and holding the title for him
until February 1, 1925, up to which time he would have
a right to pay his indebtedness and have title to the
property reconveyed to him. It denied further that the
commercial company had refused to render statements
of account to the complainant, as alleged in the bill, but
admitted that the said commercial company declined
to render the complainant an accounting showing the
operation of the plantation after its sale under the deed
of trust, alleging that complainant had no interest in the
said property after the said sale, and no right to an ac-
counting; and specifically denied that the complainant
was able, ready, and willing at any time to pay off his
indebtedness, and denied that he offered to pay it off;
denied the breach of any contract, or the existence of a
conspiracy between  the commercial company and the
bank to deprive the complainant of his plantation.   It
submitted with its answer an itemized statement of ac-
count between complainant and the commercial com-
pany from January, 1918, to March 3, 1924.   In its an-
swer were two pleas: (1) That the said company had
no interest in the life insurance policy and that the said
policy was not assigned to the said defendant company;
(2) that at the time of filing of the bill of complaint the
title to the said plantation was in E. A. Jackson, as shown
by deed of E. E. Jackson and Ella Jackson to E. A. Jack-
son, dated October 10, 1923, and therefore the complain-
ant had no right to complain.

The bank answered adopting substantially the answer
of the commercial company, and denied that the com-

mercial company had any interest in the insurance policy; denied that any agreement, verbal or written, was made between the complainant and the bank as set forth and described in the bill of complaint; denied that a conspiracy was formed and executed to deprive complainant of his plantation and place it in the hands of J. M. Howard and O. W. Nixon; denied that the plantation was at any time worth one hundred seventy-five thousand dollars; but alleged that it was never worth more than sixty thousand dollars or sixty-five thousand dollars, which was approximately the amount of indebtedness of complainant secured by deed of trust on the said plantation at the time it was sold under the bank's deed of trust. It also set up by way of plea that the complainant had sold the said plantation to E. A. Jackson, and that he held title to it at the time the suit was filed.

E. E. Jackson, the complainant, testified in support of all the allegations of his bill. He testified that in the fall of 1923 he had a contract, in writing, with the commercial company, whereby the commercial company agreed to take over and operate the Oswego plantation for the balance of the year 1923, by which arrangement, or contract, the expense of operation of the plantation would be lessened; that Mr. Nixon owned a plantation adjoining Oswego plantation, on which he had an overseer, which overseer could manage both plantations; that he (Jackson) surrendered the possession of the manager's house on the Oswego plantation to the manager of the Nixon plantation, who occupied it, and managed and controlled the Oswego plantation for the balance of the year, and was to continue its operation for the year 1924. He further testified that notwithstanding this contract with the commercial company by the terms of which it was to either satisfy the bank's deed of trust or get it extended, and to pay the notes in favor of Mrs. Hudson, due January 1, 1924, that he learned that the bank had advertised his said plantation for sale under its deed of trust, and that he thereupon sought an interview or con-

ference with Mr. Howard, president of the bank and of the commercial company, and together with his attorney they discussed the matter, and as a result of the said discussion, participated in by the complainant and his attorney on the one side, and Mr. Howard and Mr. Nixon and Mr. Mayfield, the cashier of the bank, on the other hand, the reason given for the bank's foreclosure of the deed of trust was that the banking department of the state had demanded that the said note be collected or that the deed of trust be foreclosed, else it would be charged off to the assets of the bank by the banking company; that in the said conference it was finally agreed that the bank and the commercial company would make the sale of the plantation under the deed of trust, and buy it in and hold it for Mr. Jackson until February 1, 1925; that the said agreement would be reduced to writing by the attorney for the bank and the commercial company within a few days, or as soon as he was able to do so, he then being ill and confined to his bed; that McLaurin, attorney for the complainant, desired that it be reduced to writing then, but Mr. Howard said that he was not a lawyer, but that Mr. McLaurin was a lawyer, and that his attorney would reduce it to writing so as to make a satisfactory written agreement embodying the verbal agreement; that if this should not be done by the time of the sale that they, the bank and the commercial company, would, nevertheless, buy and hold the place for the benefit and use of Mr. Jackson, with the right and privilege of his paying off the indebtedness any time before the 1st of February, 1925.

Mr. Jackson is corroborated in this statement by the testimony of Mr. McLaurin, his attorney. He is disputed in this statement by Mr. Howard, Mr. Nixon, and Mr. Mayfield. They contend that there was an agreement, a verbal one, that they would permit Mr. Jackson to redeem the place at any time by paying off his indebtedness to the bank and the commercial company on or before the 1st of February, 1925; but they deny that there

were to be any strings tied to the trustee's sale, or any agreement that would affect the bank's title to the property.

A number of letters passed between the parties to this agreement, from which it appears that an agreement of some kind was made with reference to the time and terms granted Jackson for the redemption of this property, as well as that the attorney for the bank and commercial company would reduce this agreement or contract 'to writing. Various excuses were made for the failure to reduce this agreement or contract to writing, among which were that the attorney for the bank and the commercial company had been sick in bed, and his business thereby delayed, and that he had been busy in court for a certain period of time. The letters, while not containing the terms of the agreement, recognized the verbal agreement and assured Jackson and his attorney that the agreement would be carried out; that it was Mr. Howard's wish that it should be carried out; that the bank was desirous of getting rid of the property—that it did not desire to hold it.

Subsequent to the sale and before the time for redemption expired, about the month of September, 1924, Mr. Jackson, in company with other gentlemen with whom he claimed to have arranged to pay off the indebtedness, visited the plantation and examined the crops growing thereon, the timber on the land, and the general situation, and, according to the evidence of these witnesses, requested the commercial company to furnish a complete statement up to date, giving as his reason for this request that he desired to pay off the entire amount; that the bookkeeper of the commercial company stated that if he desired the account up to the date of the sale it could be furnished very readily, but if he desired it up to date it would take several hours; that the bookkeeper suggested that if he so desired, he would make up the statement and mail it to him. Mr. Jackson readily agreed to this and requested that the statement be made up to date and

mailed to him, but that it was not mailed. Subsequently, as testified to by Mr. McLaurin, Mr. McLaurin met Mr. Howard in Jackson in the month of October, and requested the statement and stated, according to Mr. McLaurin's recollection, that Mr. Jackson had arranged to pay off the indebtedness, that he was able, ready, and anxious to do so, to which Mr. Howard replied that he did not believe that Mr. Jackson could raise the money, and did not believe that Mr. Jackson believed that he could raise the money. Mr. McLaurin protested this statement, and further stated to Mr. Howard that Mr. Jackson was in position to pay the money if he could get an up-to-date statement of his indebtedness to the bank and to the commercial company. Mr. Howard then said that if Mr. Jackson would put up one thousand dollars the statement would be furnished him, but Mr. McLaurin testified that he told Mr. Howard that Mr. Jackson could not get one thousand dollars, but could get the full amount to satisfy the claim against his property—that Mr. Jackson had arranged to this effect—provided he (Mr. Howard) would furnish a statement of Jackson's account. It was also shown by the witness Jackson that Mr. McLaurin, Mr. Burns, Mr. Alexander, and Mr. Ross, all men of means, had arranged to pay off the Jackson indebtedness; that they were ready and able to do so, if they could get a statement of the amount of the account; and Mr. McLaurin testified that if they failed to carry out the agreement and understanding, that he himself was able, willing, and ready to pay the same for Mr. Jackson, to get the matter settled and the title clear.

A number of men visited the place and looked over the crops growing there in 1924, and testified as to the condition of the crops, and their estimates of the amount of land in cultivation and the amount of cotton then on the place; it being the fall of the year when the crops had matured, and the witnesses being men of experience in such matters. While the estimates of the various witnesses varied somewhat, their general estimate was

something like four hundred acres in cotton, and that there would be a yield of from four hundred to four hundred fifty pounds of lint cotton per acre. Mr. Burns, one of the men interested in the deal in behalf of Mr. Jackson, and who was going to advance a portion of the money to Mr. Jackson, was an experienced timber man, having bought and sold timber for many years, and was also a practical farmer. Subsequently Mr. Alexander, one of the parties, died, and Jackson then not being able to close the deal, according to complainant's witnesses, same fell through, but not, however, until after the bank had sold the Oswego plantation to Mr. Nixon and Mr. Howard.

As stated above, Mr. Jackson estimated the value of the plantation to be one hundred sixty-five thousand dollars, and the personal property on the place to be ten thousand dollars. Two experienced farmers living in the Delta Section of the country, who visited the place for the purpose of appraising and valuing it, made an examination of it in company with Mr. Jackson, saw the crops growing on it in the fall of 1924, and valued the cultivated land at approximately one hundred fifty dollars per acre, and the uncultivated land at around fifty dollars per acre. One of these witnesses placed the value of the plantation at about one hundred thirty-seven thousand dollars and the other at about one hundred fifteen thousand dollars or one hundred twenty thousand dollars.

Mr. Howard and Mr. Nixon and Mr. Mayfield testified in reference to the alleged agreement, and denied the version of the agreement given by Mr. McLaurin and Mr. Jackson. They testified, however, that they did agree to give Mr. Jackson an option to buy the place during said period of time, and agreed that they would have the agreement reduced to writing by their attorney. Their attorney testified, as a witness, that it was Mr. Howard's desire to have the agreement carried out, to have it reduced to writing, but that he as their attorney had opposed any writing that would affect the bank's title to the lands, but that the bank and the commercial company

were willing at all times, and were then willing, to reconvey to Mr. Jackson the said plantation upon the payment of the amount of the indebtedness against it. They also testified as to the value of the place, that they were familiar with the lands in that community and vicinity, and that the place was not worth anything like the money claimed by the witnesses for the complainant, but that it was only worth from sixty thousand dollars to sixty-five thousand dollars.

It appears from Mr. Howard's testimony that the bank, through him, began to lend Mr. Jackson money on the plantation in 1919; that the loans were increased until they reached some twenty thousand dollars, but that thereupon he arranged with the Wilson Banking Company of Greenwood, Miss., to carry ten thousand dollars of the loan, because the loan was too large for the defendant bank to carry as a single loan; that when the note to Wilson Banking Company became due he felt obligated to take care of it, and arranged with the commercial company, of which he was also the president, to take over ten thousand dollars of the Jackson loan. He and Mr. Mayfield both testified that the bank examiner had notified them that they must reduce the loan in question by getting a substantial payment, or collecting it entirely, or that they must foreclose; that after they had purchased the land at the sale under the bank's deed of trust, the bank examiner had insisted that the bank sell the land, as it represented too much of the bank's capital; and that they made the conveyance to Howard and Nixon because of that fact.

The facts enumerated in the record are too numerous and elaborate to be set out fully here, but we believe the above is a fair summary of the pleadings and testimony, such as is necessary to an understanding of the questions involved in this suit.

It is insisted by the appellants that the bill is multifarious, and that the demurrer should have been sustained for this reason. They cite and rely upon *Carter* v. *Kim-*

*brough,* 122 Miss. 543, 84 So. 251, and the authorities therein cited, and other cases cited. We do not think the facts in the present case bring it within the rules announced in those cases.

In *Roberts* v. *Burwell,* 117 Miss. 451, 78 So. 357, this court, speaking through the present Chief Justice, said: "While the failure of each of the devisees to deliver to [the widow] . . . the cotton which he or she, as the case may be, was obligated by the will to do constitutes a separate cause of action, nevertheless they may be joined in equity in one suit for the reason that where 'the interest and liability of the defendants, though separate, flow from the same fountain, or radiate from the same center, or have a common connecting link, the joinder of such defendants and matters in the same suit is admissible.'"

In the present case the transactions originated between Jackson and the bank by Jackson giving the bank a lien on the Oswego plantation, and the assignment of an insurance policy on the life of E. E. Jackson as security for a loan. The bank from time to time increased its loan to Jackson until it reached twenty thousand dollars. The bank was one of small capital, and Mr. Howard, who represented the bank, deemed this loan to be excessive, that is to say, an excessive amount to be loaned in one loan, and he obtained the consent of the Wilson Banking Company of Greenwood to take over ten thousand dollars of the amount, placing himself under obligation, at least in his own opinion, to take care of that loan in case it should not be paid at maturity. Subsequently, contemplating the inability of Jackson to meet the ten thousand dollars indebtedness being carried by the Wilson Banking Company, and believing himself obligated to do so in such event, he arranged with the commercial company, of which he was president and in which he was largely interested, if not the dominant factor, to carry the loan. Being thus interested in the plantation, the commercial company advanced an amount

necessary for the operation of the plantation, and to take care of maturing notes. We think that was necessary to protect the interest of the bank and of the commercial company.

According to the testimony of Mr. Jackson, the life insurance policy was assigned first to the bank, and secondarily to the commercial company as additional security; and the said policy was also used to borrow money from the insurance company necessary to take care of maturing premiums, which was done with the consent of the bank and the commercial company. Each of the parties, therefore, were interested in the life insurance policy, and, with the exception of the insurance company, were interested in Oswego plantation, and in the deed and deeds of trust to secure it flowing out of these transactions. We think, therefore, that the rights of all the parties at least had a connecting link in the insurance policy. Jackson was interested in it, the bank was interested in it, and, if the testimony of Jackson be accepted as the chancellor did accept it, the commercial company was also interested in it. All of these transactions were intermingled in the life insurance policy, and it was necessary for Jackson to get complete relief and get the policy returned to him to make the insurance company a party defendant. It was not necessary for them to have the same interest throughout or in every branch of the controversy.

In the third syllabus of *Middleton* v. *Howell*, 127 Miss. 880, 90 So. 725, it is said:

"Equity has jurisdiction of causes to save a multiplicity of suits, and where the interests of all parties have a common origin, or flow from the same center, or radiate from the same center, or have a common connecting link, then equity may retain jurisdiction, even though it may require adjudicating separate rights of action and rendering separable judgments."

In *Tribette et al.* v. *Illinois Central Railroad Co.*, 70 Miss. 182, 12 So. 32, 19 L. R. A. 660, 35 Am. St. Rep. 642,

147 Miss.—21.

this court, speaking through Judge CAMPBELL, settled these principles announced in the above cases. At page 187 of the Mississippi Report (12 So. 32) it is said:

"It has been found that many of the cases he pressed into service to support his [Pomeroy's] assertion are on the subject of joinder, where confessedly there could be no doubt that the matter was of equity cognizance. Every case he cited to support his text will be found to be either where each party might have resorted to chancery or been proceeded against in that forum, or to rest on some recognized ground of equitable interference other than to avoid multiplicity of suits. The cases establish this proposition, viz.: Where each of several may proceed or be proceeded against in equity, their joinder as plaintiffs or defendants in one suit is not objectionable; but this is a very different question from that, whether, merely because many actions at law arise out of the same transaction or occurrence, and depend on the same matters of fact and law, all may proceed or be proceeded against jointly in one suit in chancery; and it is believed that it has never been so held, and never will be, in cases like those here involved. Where each of several parties may proceed in equity separately, they are permitted to unite, and make common cause against a common adversary, and one may implead in one suit in equity many who are his adversaries, in a matter common to all in many cases, but never when the only ground of relief sought is that the adversaries are numerous, and the suits are for that not in itself a matter for equity cognizance. Attention to the distinction mentioned will resolve all difficulties in considering the many cases on this subject. There must be some recognized ground of equitable interference, or some community of interest in the subject-matter of controversy, or a common right or title involved, to warrant the joinder of all in one suit; or there must be some common purpose in pursuit of a common adversary, where each may resort to equity, in order to be joined in one suit; and it is not enough that

there 'is a community of interest merely in the question of law or of fact involved.' "

See, also, *Robertson* v. *Monroe County,* 118 Miss. 541, 79 So. 187; *Cumberland Tel. & Tel. Co.* v. *Williamson,* 101 Miss. 1, 57 So. 559; *I. C. Railroad Co.* v. *Garrison,* 81 Miss. 257, 32 So. 966, 95 Am. St. Rep. 469; *Crawford* v. *M., J. & K. C. R. Co.,* 83 Miss. 708, 36 So. 82, 102 Am. St. Rep. 476. See, also, Griffith's Miss. Chancery Practice, sections 197-206; R. C. L., pp. 429-433.

It is also contended that the court of equity in Lauderdale county did not have jurisdiction. This argument is based largely upon chapter 149, Laws of 1918, amending section 707, Code of 1906, as amended by subsequent acts. This section reads as follows:

"707 (650). *Venue of Actions; in What County, General;* Chapter 166; Laws 1908.—Civil actions of which the circuit court has original jurisdiction shall be commenced in the county in which the defendant or any of them may be found, and if the defendant is a domestic corporation, in the county in which said corporation is domiciled, or in the county where a place of business of such corporation may be or in the county where the cause of action may occur or accrue except where otherwise provided, and except actions of ejectment and actions of trespass on land, and actions for the statutory penalty for cutting and boxing trees and firing woods and actions for the actual value of trees cut which shall be brought in the county where the land, or some part thereof, is situated; but if the land be in two or more counties, and the defendant resides in either of them, the action shall be brought in the county of his residence, and in such cases, process may be issued against the defendant to any other county. If a citizen resident in this state shall be sued in any action, not local, out of the county of his household and residence, the venue shall be changed, on his application, to the county of his household and residence."

Appellants rely on the cases of *Indianola Cotton Oil Co.* v. *Crowley,* 121 Miss. 262, 83 So. 409; *Plummer-Lewis Co.* v. *Francher,* 111 Miss. 656, 71 So. 907; *Morrimac Veneer Co.* v. *McCalip,* 129 Miss. 671, 92 So. 817. The argument proceeds upon the idea, we think, that the insurance company is not a necessary party to this suit. In the case of *Plummer-Lewis Co.* v. *Francher, supra,* it was held that a corporation sued alone out of the county of its domicile and where it had no office, the suit must be dismissed. We are unable to agree with the contention of counsel for the appellant that the insurance company was not a necessary party to complete relief. If Jackson's theory of the case be correct, and if jurisdiction existed in equity to grant relief upon the facts established by him to the satisfaction of the chancellor, Jackson had not only the right to recover a judgment for his damages, but had the right to have the debts owing to the two domestic corporations canceled and the assignment of the insurance policy canceled and policy restored to him.

It is argued that the insurance company was not interested and, as a matter of course, would restore the policy, or place it in conformity to what the court might adjudge as between the complainant and the defendants. That might be true; but the answer to that contention is, it seems to us, that the insurance company would not be compelled to, nor could it ordinarily, do so against the contentions and objections of the assignees, without subjecting itself to litigation. And if any litigation arose it would probably implead the parties. It would have the power, however, under its assignment, to transfer it to any assignee of the purchaser if the bank should undertake to sell it under its power as assignee, to apply to Jackson's debt. The policy, if the debt should be wiped out, would belong to Jackson, and he ought not to be required to first litigate the two defendants separately, and then litigate the insurance company in order to get what could be had by one suit. See Hemingway's Code,

sections 488, 486, 465, 4093, and 4094; *Pullman Palace Car Co.* v. *Lawrence,* 74 Miss. 782, 22 So. 53; *American Surety Co.* v. *Holly Springs,* 77 Miss. 428, 27 So. 612.; *Indianola Cotton Oil Co.* v. *Crowley,* 121 Miss. 262, 83 So. 409; *Campbell* v. *Triplett,* 74 Miss. 365, 20 So. 844.

It is contended that the bill does not entitle complainant to relief, because no sufficient fraud is shown to make an actionable cause, and because the contract was not reduced to writing; that, therefore, the statute of frauds prevents the court granting relief. Among the cases relied on is *Schroeder* v. *Young,* 161 U. S. 334, 16 S. Ct. 512, 40 L. Ed. 721. In discussing the principle here involved, at page 344 of 161 U. S. (16 S. Ct. 516), the court said:

"The court further found that defendants purposely and intentionally failed to inform the plaintiff that they had a title to the said lot at the time the plaintiff was redeeming the same from the tax sales. The court further found that the said attorneys, in violation of their duty to obtain the highest possible price for the property while acting in behalf of their clients, became the bidders upon said property, and so acted as to obtain the same for the least possible sum, so as to satisfy the judgment, and at the same time to sell all the property belonging to said Young. If these facts be not sufficient to justify a rescission of these sales, it is difficult to imagine what would be so considered.

"Defendant relies mainly upon the fact that the statutory period of redemption was allowed to expire before this bill was filed, but the court below found in this connection that before the time had expired to redeem the property the plaintiff was told by the defendant Stephens that he would not be pushed, that the statutory time to redeem would not be insisted upon; and that the plaintiff believed and relied upon such assurance. Under such circumstances the courts have held with great unanimity that the purchaser is estopped to insist upon the statutory period, notwithstanding the assurances were

not in writing, and were made without consideration, upon the ground that the debtor was lulled into a false security. *Guinn* v. *Locke,* 1 Head (Tenn.), 110; *Combs* v. *Little,* 4 N. J. Eq. 310 (40 Am. Dec. 207); *Griffin* v. *Coffey,* 9 B. Mon. (Ky.) 452 (50 Am. Dec. 519).; *Martin* v. *Martin,* 16 B. Mon. (Ky.), 8; *Butt* v. *Butt,* 91 Ind. 305; *Turner* v. *King,* 2 Ired. Eq. (37 N. C.) 132 (38 Am. Dec. 679); *Lucas* v. *Nichols,* 66 Ill. 41; *McMakin* v. *Schenck,* 98 Ind. 264. In *Southard* v. *Pope's Ex'rs,* 9 B. Mon. (Ky.) 261, 264, it is said that 'a refusal by the purchaser to accept the money and permit the redemption to be made within the time agreed would be a fraud upon the defendant in execution, and authorize an application by him to a court of equity for relief.' "

Another case cited by appellants is *Prondzinski* v. *Garbutt,* 8 N. D. 191, 77 N. W. 1012. In the second syllabus of that case as reflected by the official report, it is said:

"Where a complaint states that the holder of a sheriff's certificate of sale of real estate by fraud and false promises prevented the owner from redeeming within the statutory period, and, in violation of his oral agreement to extend the period of redemption, took a sheriff's deed, such facts entitled the aggrieved party to relief in equity."

The power of courts of equity to give relief in this class of cases has not only been generally recognized, but has also been unhesitatingly exercised when the proper state of facts require it. *Kritzer* v. *Moffat,* 136 Wash. 410, 240 P. 355, 44 A. L. R. 681, and authorities cited in the case, and in case note in American Law Reports.

Another case cited by appellants is *Heyland* v. *Badger,* 35 Cal. 404. This also appears to have been a suit in a court of law. In the last syllabus of the case it is said:

"In case of a chattel mortgage the remedy of the mortgagor is by bill in equity to redeem, and his equity of redemption cannot be cut off by the mortgagee, except by a public sale of the property on due notice."

At page 415, on petition for rehearing, the court said:
"We only consider the title at law. We admitted an
equity of redemption, and held only that appellant's rem-
edy was in equity to redeem. There is no doubt, that to
cut off this equity of redemption, a sale must be made on
due notice. Had the sale been regular upon due notice
given, all rights, both legal and equitable, would have
been cut off. The complaint in this case presents the case
only in a legal aspect, and in that aspect only did we de-
termine it."

Another case cited by appellants is *Jasper* v. *Hazen*,
1 N. D. 75, 44 N. W. 1018. This case also seems to be one
at law and not in equity. In the third syllabus it is said:
"Plaintiff's remedy in such case is in equity. No ac-
tion can be maintained at law by the *cestui que trust*
against the trustee while the trust remains open, unless
the exact amount due the *cestui que trust* has been in
some manner liquidated, and no act remains to be per-
formed except payment."

Another case cited is *Norton* v. *Ray*, 139 Mass. 230,
29 N. E. 662. This, too, seems to have been an action at
law, and the court distinctly held that the remedy was in
equity, because it was a breach of trust. The opinion is
short, and reads as follows:

"The plaintiff's only remedy is in equity. The case
discloses a trust, and cannot be brought within the de-
cisions in which it has been held that an action for money
had and received will lie against a trustee by a *cestui que
trust* to recover a liquidated sum due to him under the
trust. *Johnson* v. *Johnson*, 120 Mass. 465, and cases
cited; *Davis* v. *Coburn*, 128 Mass. 377."

The case here before us is in equity, and these cases
held that equity is the proper forum.

Appellants also cite the case of *Welch* v. *Lawson*, 32
Miss. 170, 66 Am. Dec. 606. The court was there dealing
with a different case, but recognized the principle of
liability, but limited the amount of recovery to expenses
and actual losses sustained by virtue of reliance upon the

oral contract. At page 177 of the Mississippi Report ·(66 Am. Dec. 606) it is said:

"If it were true that the action was brought to recover damages resulting merely from a violation of the parol agreement, the demurrer should have been sustained. But such was not the nature of the action. It was intended to recover damages resulting from the fraudulent conduct of the defendant. The plaintiff was seeking compensation for his trouble and loss of time, and not compensation for the loss of a bargain, in not getting the land, about which the parties had a parol understanding. The plaintiff merely said to the defendant, pay me for my trouble and loss of time, occasioned by your fraud or bad faith; I ask nothing for the loss of my bargain, but only to be placed in the same situation·in which I stood before I trusted you. Thus viewing the action, we are of opinion that the demurrer was properly overruled. Almost all contracts must go through various stages before they are finally consummated; and whether a party will be liable for a breach of faith before the final consummation of the contract, must depend upon the extent to which he induced the other party to trust him. As, for instance, suppose a man at Jackson is negotiating with a man at Columbus, for the purchase of a tract of land, and the parties, understanding the terms of the proposed contract, the one at Columbus should say to the other at Jackson, that if he would come to the former place, the contract should be closed by writing, as understood between them, would not the party incurring the expense and trouble thus occasioned, have a clear right to compensation for such trouble, loss of time, and expense, if the party at Columbus should refuse, without sufficient reason, to·comply with his promise? No good reason can be assigned why an action could not be maintained in such a case. The party went not to make, but to close a contract. He would not go to Columbus merely to ascertain whether such a contract could be made, but to give legal form to one already understood between the parties."

That case is distinguished from the one at bar, the facts being materially different and the two cases governed by distinct principles. Here appellee's lands had been advertised for sale, and were to be sold. Complainant's version of the agreement was, that the lands would not be sold under the agreement until the contract of agreement was reduced to writing. He was induced by the promise, and his reliance on it, to acquiesce in what was to be done on the faith of the promise. It appears that the great trouble between the parties was the insistence of the bank examiner that the foreclosure be made, and the promise that the rights of the parties would either be reduced to writing before the sale, or that the sale would be postponed until the agreement was put in writing, or that if the sale was made that the property would be held for the benefit of the party; that the sale would be made only for the purpose of satisfying the bank examiner.

The appellants also rely on *Cain* v. *Kelly,* 57 Miss. 830, which was a case of parol agreement, and was tried in the circuit court. In the first syllabus of that case it is said:

"The vendee of land under a parol agreement can recover only for loss directly incurred by reason of the vendor's fraud, and upon a state of case which would sustain an action for deceit as described in *Sims* v. *Eiland* (57 Miss.), *ante* 607."

And in the second syllabus of that case it is said: "He cannot recover for losses sustained by anything which occurs between himself and the vendor after he hears of the latter's unwillingness to reduce the contract to writing because of doubt as to his right to sell the land."

We think that case is also distinguishable from other cases that will be hereafter referred to.

In *Klein* v. *McNamara,* 54 Miss. 90, fifth syllabus, it is said: "M. being greatly embarrassed, his wife allowed him to raise money on her house. B., to whom he was led to apply, declined, after legal advice, to take a mortgage,

but agreed to take a deed and loan the money, to be repaid in twelve months, with one and a quarter or one and a half per cent a month interest. McNamara and wife executed the deed on the parol understanding that a reconveyance was to be made on repayment of the money. Subsequently, ill feeling sprang up between B. and M., and the latter explained the matter to K., who paid B. the balance of one thousand eight hundred seventy-five dollars and received a quitclaim deed from B., reciting the consideration to be one thousand dollars. K. claimed that two thousand dollars was due to B., and that he had made further advances to M. Held, a mortgage to secure the sum paid by K. to B., and that parol evidence was admissible to show its true character. Held, further, that Mrs. M.'s consent bound her house until the amount paid by K. to B. was refunded, but that sum being repaid, the property was not security for future loans.''

In *Finucane* v. *Kearney et al.*, Freem. Ch. 65, it was held that—''Where there has been a payment of the purchase money, and the vendee has been let into possession of land sold under a parol contract, and suffered to make valuable improvements thereon, these circumstances are sufficient to take the case out of the operation of the statute of frauds, and warrant a decree for a specific performance of the parol contract.''

It was held, also, that—''Where the contract was written out, and one of the parties promised to sign it, but was prevented by his death, held, that this was an exception to the statute of frauds.''

At page 69 of the report it is said: ''An acknowledged exception to the statute is where the agreement is intended to be reduced to writing according to the statute, but is prevented by the fraud of one of the parties. New on Con., chapter 10, 179 to 197; 1 P. Wm. 618. And so I apprehend the rule would be, where, as in this case, the contract was written out and one of the parties promised to sign it, but was prevented by inevitable accident. See 2 Story's Eq. 79. It is the peculiar province of court

of equity to relieve against accidents as well as fraud. It is alleged also that the complainants have made valuable improvements upon the lot. This has been repeatedly held as an act of part performance. 3 Ves. 378 (*Parkhurst* v. *Van Cortlandt*) 1 Johns. Ch. (N. Y.) 274; (*Brockway* v. *Copp*) 3 Paige (N. Y.) 545 (not in point). Whether these allegations can be proved, is a question that does not arise in the present inquiry. A part performance has no other effect, except that the plaintiff is thereby let in to prove the contract otherwise than by writing.''

In *Soggins* v. *William S. Heard,* 31 Miss. 426, it is held, in the first syllabus, that—''It is well settled that when a party agrees, before the sale, with the judgment debtor, whose land has been levied on, that he will purchase it and give the debtor the benefit of the purchase, that the agreement is binding, and not within the statute of frauds; and a purchaser, under such circumstances, is a trustee for the debtor.''

At pages 428 and 429 of the report, the court said: ''It is not an open question, that when a party agrees before the sale to purchase property about to be sold under an execution against a party, and to give such party the benefit of the purchase, that the agreement is binding, and will be enforced. The defendant, upon the faith of such an agreement, may have ceased his efforts to raise the money for the purpose of paying off the execution, and thus preventing a sale of his property. It will not do to say that the party promising, was moved merely by friendly or benevolent considerations, and may, therefore, at his option, decline a compliance with his agreement. Such considerations constitute the foundation of almost every trust, and the trustee should be held to account as nearly as possible, in the same spirit in which he originally contracted. But it is said that the agreement, if in fact made, was void under the statute of frauds. The statute has reference alone to the sale of lands, and not to a contract to purchase by one person for the benefit of another.''

In *Natchez* v. *Vandervelde,* 31 Miss. 706, 66 Am. Dec. 581, it was held, in the first syllabus, that—"A parol agreement between the plaintiff and defendant in an action of ejectment, by which judgment was entered for the plaintiff for the whole of the premises sued for, but the execution was to be restricted to that part only to which it was conceded his title extended, is not a contract for the sale or assurance of land and therefore not within the statute of frauds."

It was further held that—"A parol agreement, by which the parties to an action of ejectment stipulated that judgment should go for the plaintiff for the whole of the premises in controversy, but that his title extended only to a part, and that defendant's title was good to the remainder, and that the parties would occupy the premises in severalty, according to the agreed title, if carried out by each party taking possession of the portions conceded to him, is in effect a settlement by the parties of their claims to the parts of the land to which they are respectively entitled, and a parol partition of it, executed by possession in severalty, which is well-settled, is valid and binding between the parties."

In *Barton* v. *Magruder,* 69 Miss. 462, 13 So. 839, it was held that—"Where land is sold under a decree, by agreement of all parties, it being bought in by one who is interested in the decree as mortgagee, and who receives a deed undertaking to hold the title for the benefit of defendant, the original owner, who advances a part of the money to buy it in, may enforce a resulting trust against the purchaser for the amount so advanced, though the agreement in respect to the title is by parol."

See, also, Story's Equity (14th Ed.), sections 452-454; 27 C. J., at pages 340-342, wherein it is said: "So equity will afford relief notwithstanding the statute in all cases of resulting or constructive trusts. An oral contract within the statute will be enforced in equity against a party who fraudulently prevents the contract from being reduced to writing, or where reduction to writing has been

prevented by accident, as by the death of a party before signing."

The suit in the present case is not to specifically enforce a parol contract. It is for the recovery of damages from promises made by one party and relied upon by the other, whereby he has been damaged by trusting the party upon whom he relied. The testimony, it is true, is conflicting; but the chancellor had the witnesses before him, heard them testify, and was in position to better determine the questions of credibility, interest, and other things that affect the weight of human testimony. Taking the facts to be true as thus found by the chancellor, we are of opinion that the complainant was entitled to relief.

Upon the question of the amount of damages we are unable to agree with the chancellor, and think his finding is excessive. It is true that there is some testimony to support the amount of the judgment, but we think the chancellor has an erroneous conception of what the complainant was entitled to recover, and that his conclusions from the testimony render the amount of the judgment excessive and inequitable.

This case is one of peculiar difficulty for any court or trier of fact to harmonize all the testimony, and to do full justice to all parties; but the administration of justice is the chief end for the existence of courts, and when conclusions are to be drawn from facts and opinions blended, the court has a difficult duty to perform. We must consider the fact that in opinion evidence there will be a wide divergence of opinion between the most sincere and honest witnesses, and sometimes this divergence is exceedingly great. And that is true in the present case, although in the present case it appears that all the parties are men of high standing in business and otherwise. Their judgments as to values have differed widely.

The record contains a very full description of the situation and condition of the lands here involved, and the amount and character of the lands for farming and other

purposes are before us. It is too elaborate to be set forth in an opinion. Two witnesses testified for the complainant, who, it appears from the record, were disinterested witnesses. Their knowledge of the general conditions existing throughout the Delta seems to have been extensive and comprehensive. They were not, however, fully conversant with all the material facts shown in the record, concerning the land in question. The complainant fixed the value at a very high figure. There are many things in the record which tend to show that in the year 1924 there was an excellent crop raised upon the Oswego plantation, that general conditions were favorable, and in that year, no doubt, lands were held to be more desirable and more valuable than at the period of the trial, when a good deal of the land was standing under water. It appears from the evidence that in 1917 the lands were purchased for fifty-five thousand dollars; that in 1924 and 1925 they were more valuable than in 1917. The fact that there were incumbrances upon the lands amounting to about sixty-five thousand dollars, when considered with the known habit of business men, especially men connected with banks and similar institutions, of allowing a suitable margin of safety in their financial transactions, it is evident that the lands were worth more than the incumbrances. The two witnesses who visited the lands for the purpose of appraising them, and who are not shown to have been interested therein, differed about twenty-thousand dollars in their valuations. They were much lower than the plaintiff's estimate of their value, and much higher than the defendant's estimate of their value. Usually, in contests of this kind, the truth will be found between the extremes. It appears that the personal property on the plantation was valued around ten thousand dollars, and was sold at public sale for four hundred dollars. The complainant, after purchasing the lands, had put something like seventy-five acres in cultivation, thereby increasing their value; he also erected some tenant houses, and made other

improvements thereon. He stated that he had paid considerable interest on his original purchase price. So, in undertaking to do justice to all parties according to the rules of law, as we understand them, we think the complainant should be made whole, but that he should not be allowed theoretical and fictitious valuations.

The proof of the defendants that the lands had been and were being offered for sale at the amount of the indebtedness is not without force. It is indeed a very persuasive part of the evidence, but it is not entirely controlling. Judgments are not controlled by opinions entirely. *Salter* v. *Jennings Furniture Co.* (Miss.), 109 So. 704. Opinions are persuasive and enlightening, but not necessarily controlling. We must take many things into consideration in determining the just amount that should be allowed in the present case. We are of opinion, after full consideration, that the judgment for ninety thousand dollars rendered by the chancellor should be reduced to the sum of fourteen thousand six hundred dollars, with interest from the date of the trustee's sale, leaving the judgment in other respects as rendered by the chancellor.

*Affirmed in part, and reversed in part.*